No. 108,648

In the Matter of MARK A. GALLOWAY, *Respondent*.

(293 P.3d 696)

Opinion filed January 11, 2013.

*Kate Baird*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the formal complaint for the petitioner.

*John J. Ambrosio*, of Ambrosio & Ambrosio, Chtd., Topeka, argued the cause, and *Mark Allen Galloway*, respondent, argued the cause pro se.

*Per Curiam:* This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Mark A. Galloway, of Hayesville, an attorney admitted to the practice of law in Kansas in 2003.

On March 7, 2012, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent's motion for additional time to answer was granted, and he filed an answer on April 4, 2012. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on May 2, 2012, where the respondent was personally present and was represented by counsel. The hearing panel determined that respondent violated KRPC 1.2(d) (2011 Kan. Ct. R. Annot. 428) (scope of representation); 1.7(a)(2) (2011 Kan. Ct. R. Annot. 484) (conflict of interest); 4.1(a) (2011 Kan. Ct. R. Annot. 581) (truthfulness in statements to others); and 8.4(c) (2011 Kan. Ct. R. Annot. 618) (engaging in conduct involving misrepresentation).

Upon conclusion of the hearing, the panel made findings of fact and conclusions of law, together with its recommendation to this court, the relevant portions of which follow:

"FINDINGS OF FACT

. . . .

"7.   The Respondent conducts his law practice as Advanced Legal Planning, LLC. The Respondent is, and at all times has been, the only attorney and full time employee of Advanced Legal Planning.

"8. Joe Cox, an insurance agent, formed EPIC Insurance Group (EPIC), an organization of insurance agents in the Wichita, Kansas, area.

"9. In 2009, the Respondent agreed to make himself available to assist Mr. Cox and other agents with EPIC, as they marketed life insurance to friends and family. Mr. Cox informed the Respondent that through another entity he owned, Legacy Life Capital, LLC ('Legacy Life'), he had secured short term financing for the premium of the first year of these policies.

"10. The agents marketed the use of trusts as owners of the life insurance policies being offered to the insured. With the Respondent's consent, the agents designated the Respondent as trustee when the insured did not designate a trustee. Mr. Cox paid the Respondent a fee to serve as trustee.

"11. The Respondent drafted four form trust documents for the agents. The four form trust documents were for a married male, a single male, a married female and a single female. The Respondent anticipated that the trust documents would be modified on an as needed basis by the agents.

"12. In late 2009 and 2010, Mr. Cox and the other agents marketed life insurance policies to family and friends, at no cost to the insured through Mutual of Omaha and Minnesota Life. During the first year, the life insurance policies would each have a value of a minimum of $1 million. Following the first year, the policies would each have a value of $10,000.

"13. Mr. Cox secured short term loans for the premium for the first year. The life insurance policies were to be offered as collateral for the short term loan. After one year, the insurance companies would pay the agents the commission for the policy. A portion of the commission would be used to pay off the short term loan.

"14. The agents began marketing the policies in the Wichita, Kansas, area. The agents prepared applications for life insurance policies and provided the applications to the insureds. The applications for life insurance included a statement that the insured did not intend to finance the premium. Additionally, the agents provided the insureds with a trust document, drafted by the Respondent, creating an irrevocable trust.

"15. The Respondent and/or Advanced Legal Planning was designated as trustee in approximately 40 trusts created in 2010 by Mr. Cox and other agents.

"16. After the insured signed the application for life insurance, Mr. Cox or another agent delivered the trust document to the Respondent for signature as trustee. The Respondent knew that the applications for life insurance included a statement that the insured did not intend to finance the premium. Additionally, the Respondent knew that the premiums for the life insurance policies were being financed through Legacy Life.

"17. Further, the Respondent executed an application for life insurance for himself through Mr. Cox which contained a statement that the Respondent did not intend to finance premium payments due under the policy. However, the Respondent knew that Legacy Life was financing the premium payment for his own life insurance policy.

"18.    As trustee of the life insurance trusts, the Respondent executed promissory notes offering the life insurance policies as collateral for the short term loans obtained by Legacy Life. The Respondent had no contact with the proposed insured or their beneficiaries regarding the financial transaction.

"19.    The Respondent believed that Mr. Cox and the other agents were his clients. The Respondent believed that he could market other estate planning products to the insureds as they would, by virtue of the trust, become his clients, also.

"20.    Between May 2010, and October 2010, the Respondent received, by electronic deposit, just under $3 million from Legacy Life. The funds were received into an account of Advanced Legal Planning. The account was not designated as an attorney trust account.

"21.    According to the Respondent's bank records, a number of the electronic transfer of funds made from Legacy Life to Advanced Legal Planning, were made to the attention of Linette Talbott.

"22.    Between May 2010, and October 2010, electronic payments were made from the Advanced Legal Planning account to insurance companies to satisfy the initial annual premium for life insurance policies held in trust.

"23.    In November 2009, Mark Hauser approached Patricia Adams about obtaining a life insurance policy at no cost to her. Ms. Adams understood that the life insurance policy would have a value of $10,000.

"24.    Mr. Hauser provided Ms. Adams with documents necessary to complete the transaction. Ms. Adams signed the necessary applications, as well as other items provided by Mr. Hauser. Ms. Adams did not closely read the documents.

"25.    Mutual of Omaha initiated an investigation in 2010 into the activities of a group of agents in the Wichita, Kansas, area after noticing an unusually high volume of sales. In 2010, an insurance investigator contacted Ms. Adams regarding her life insurance policy. The insurance investigator explained to Ms. Adams that he was investigating possible insurance violations by agents in her area.

"26.    The insurance investigator asked Ms. Adams about the $1 million life insurance policy that was being held in the Patricia Adams Family Trust, with the Respondent as trustee. Ms. Adams explained that she was not familiar with the Respondent and that she was unaware of a trust. Ms. Adams explained that she understood that she had a $10,000 life insurance policy and that she had received the policy at no cost to her. Ms. Adams had designated her daughter as the beneficiary.

"27.    Ms. Adams stated that she signed the documents presented by Mr. Hauser. Ms. Adams informed the insurance investigator that she did not execute any documents before a notary public.

"28.    Ms. Adams recalled discussing the possibility of establishing a trust and she understood that the trust would allow the proceeds to go directly to her daughter upon her death. Ms. Adams was asked to identify a 'trust protector.' Ms. Adams designated Rob Richardson as the trust protector. Ms. Adams, however, did not understand that a trust was being created and that the trust owned the policy.

"29. Ms. Adams informed the insurance investigator that she did not know who paid the premium nor was she aware that the premiums had been financed.

"30. The Respondent signed the trust document as trustee of the Patricia Adams Family Trust. According to the trust document, Ms. Adams acknowledged the trust document before Ms. Talbott, notary public, on January 8, 2010. Ms. Talbott's notary stamp appears on the instrument.

"31. The Respondent's signature appears on the instrument and it purports to have been notarized on the same day by Ms. Talbott. The trust document authorizes Ms. Talbott to remove the trust protector designated by the insured 'at any time, with or without cause.'

"32. On June 11, 2010, the Respondent executed a promissory note offering Ms. Adams' life insurance policy as collateral for an $11,625.11 obligation of his client, Legacy Life. The maturity date on the note was June 11, 2011.

"33. Ms. Adams ultimately directed the Respondent to cancel the policy.

"34. As a result of the investigation by the insurance company and in conjunction with an investigation by the Kansas Insurance Department, a settlement agreement was entered into between Mutual of Omaha, Mr. Cox, and the trusts, rescinding the life insurance policies and returning the premium payments.

"35. The Respondent entered into the settlement agreement as trustee of the trusts. The Respondent had no contact with the insureds or the beneficiaries of the trusts prior to executing the settlement agreement and release of claims.

"36. Mr. Cox voluntarily surrendered his license to sell insurance in the State of Kansas during the pendency of the insurance investigation.

### "CONCLUSIONS OF LAW

"37. Based upon the Respondent's stipulations as well as the findings of fact above, the Hearing Panel concludes as a matter of law that the Respondent violated KRPC 1.2(d), KRPC 1.7(a)(2), KRPC 4.1(a), and KRPC 8.4(c), as detailed below. [Footnote: In addition to KRPC 1.2, KRPC 1.7, KRPC 4.1, and KRPC 8.4(c), the Disciplinary Administrator also alleged that the Respondent violated KRPC 1.1, KRPC 1.4, KRPC 1.15, and KRPC 8.4(g). At the hearing, the [Deputy] Disciplinary Administrator argued that KRPC 1.15 applied. However, she did not argue that the Respondent violated the remaining rules. The Hearing Panel concludes that clear and convincing evidence was not provided to support a violation of KRPC 1.1, KRPC 1.4, and KRPC 1.15. Specifically, the Hearing Panel concludes that the Respondent did not have an attorney-client relationship with the insureds. Further, the Hearing Panel concludes that all of the Respondent's misconduct is clearly addressed by specific rules and a conclusion that the Respondent violated KRPC 8.4(g), the catch-all provision of the Kansas Rules of Professional Conduct, would be duplicitous.]

"38. KRPC 1.2(d) provides:

'A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and

may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.'

The Respondent stipulated that he violated KRPC 1.2(d) because he assisted a client in conduct that he knew was fraudulent. As such, the Hearing Panel concludes that the Respondent violated KRPC 1.2(d).

"39.   KRPC 1.7 provides:

'(a)   Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

. . . .

(2)   there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.'

The Respondent stipulated that his conduct violated KRPC 1.7(a)(2) because there was a substantial risk that his representation of EPIC Insurance, his fiduciary obligation as trustee of the trusts and/or his personal interests would be in conflict. Thus, the Hearing Panel concludes that the Respondent violated KRPC 1.7(a)(2).

"40.   KRPC 4.1(a) provides that '[i]n the course of representing a client a lawyer shall not knowingly make a false statement of material fact or law to a third person.' The Respondent violated KRPC 4.1(a) when he signed approximately 40 trust documents knowing that the applications for insurance included false statements. By signing the trust documents, knowing of the false statements, the Respondent incorporated the false statements. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 4.1(a).

"41.   'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The Respondent engaged in conduct that involved dishonesty when he assisted his client in committing fraud. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(c).

## "AMERICAN BAR ASSOCIATION
## "STANDARDS FOR IMPOSING LAWYER SANCTIONS

"42.   In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"43.   *Duty Violated.* The Respondent violated his duty to the public and the legal profession to maintain his personal integrity.

"44.   *Mental State.* The Respondent knowingly violated his duty.

"45. *Injury*. As a result of the Respondent's misconduct, the Respondent caused potential injury to the insured and actual injury to the legal profession.

"46. *Aggravating or Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"47. *Dishonest or Selfish Motive*. The Respondent's misconduct was clearly motivated by dishonesty. Assisting others in engaging in fraudulent conduct is serious dishonest misconduct.

"48. *A Pattern of Misconduct*. The Respondent executed approximately 40 life insurance trust documents. Each of the trust documents [was] based upon applications for life insurance which contained false statements. The Hearing Panel concludes that the Respondent engaged in a pattern of misconduct.

"49. *Multiple Offenses*. The Respondent violated KRPC 1.2(d), KRPC 1.7(a)(2), KRPC 4.1(a), and KRPC 8.4(c). As such, the Hearing Panel concludes that the Respondent committed multiple offenses.

"50. Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"51. *Absence of a Prior Disciplinary Record.* The Respondent has not previously been disciplined. The Respondent's lack of disciplinary record is a mitigating factor.

"52. *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions.* The Respondent fully and freely acknowledged his misconduct.

"53. *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney.* The Respondent is an active and productive member of the bar in the Wichita area. The Hearing Panel received and reviewed a number of letters in support of the Respondent. Clearly, the Respondent enjoys a good reputation in his community.

"54. *Remorse*. At the hearing on the formal complaint, the Respondent expressed genuine remorse for engaging in the misconduct. The Respondent's remorse mitigated his misconduct.

"55. In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'4.32 Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.

'5.11 Disbarment is generally appropriate when:

(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses;

(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.'

'7.2    Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

### "RECOMMENDATION

"56.    The Disciplinary Administrator recommended that the Respondent be suspended for a period of one year. Additionally, the Disciplinary Administrator recommended that the Respondent undergo a reinstatement hearing, pursuant to Kan. Sup. Ct. R. 219, prior to reinstatement. The Respondent declined to make a recommendation. However, counsel for the Respondent acknowledged that the misconduct in this case calls for a published censure at a minimum. Counsel for the Respondent also suggested that a reinstatement hearing is not warranted in this case.

"57.    The seriousness of the Respondent's misconduct—active participation in a fraud—calls for serious consequences. Based upon the findings of fact, conclusions of law, and the Standards listed above, the Hearing Panel unanimously recommends that the Respondent be suspended from the practice of law for a period of two years. Additionally, the Hearing Panel recommends that the Kansas Supreme Court require the Respondent to undergo a full evidentiary hearing prior to the consideration of a petition for reinstatement, pursuant to Kan. Sup. Ct. R. 219.

"58.    Further, the Hearing Panel would caution the Respondent from practicing law over [the] Internet, from engaging in the unauthorized practice of law, and from assisting others in the unauthorized practice of law. Generally, the Respondent needs to better educate himself regarding his ethical obligations. He needs to be able to recognize the unauthorized practice of law. If the Respondent was not representing the insureds, then he was assisting the agents in the unauthorized practice of law. If he was representing the insureds, then he owed them duties which he did not fulfill. Prior to reinstatement, the Respondent needs to clearly establish that he understands his obligations with regard to KRPC 5.5.

"59.    Costs are assessed against the Respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence,

the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2011 Kan. Ct. R. Annot. 334). Clear and convincing evidence is " 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable." ' " *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

The respondent filed no exceptions to the hearing panel's final hearing report. As such, the findings of fact are deemed admitted. Supreme Court Rule 212(c), (d) (2011 Kan. Ct. R. Annot. 352). Respondent was given adequate notice of the formal complaint, to which he filed an answer, and adequate notice of both the hearing before the panel and the hearing before this court. We conclude the hearing panel's findings are supported by clear and convincing evidence. Thus, the only issue before us is the appropriate discipline.

At the hearing before this court, at which the respondent appeared, the office of the Disciplinary Administrator agreed with the hearing panel's recommendation of a 2-year suspension with a reinstatement hearing pursuant to Kansas Supreme Court Rule 219 (2011 Kan. Ct. R. Annot. 380). The respondent made no recommendation, albeit he acknowledged the propriety of a suspension for his conduct.

"The recommendation of the panel or the Disciplinary Administrator as to sanctions to be imposed shall be advisory only and shall not prevent the Court from imposing sanctions greater or lesser than those recommended . . . ." Supreme Court Rule 212(f) (2011 Kan. Ct. R. Annot. 352). Accordingly, we determine that it is in the best interests of the public and the respondent to slightly modify the panel's recommendation. Specifically, the respondent should serve a 2-year suspension followed by a full reinstatement hearing at which the respondent will present the following: (1) a psychological evaluation that addresses whether respondent suffers from any condition that would impede his ability to practice law

effectively; (2) such other documentation as shall be requested by the Disciplinary Administrator's office; and (3) a plan of probation under which respondent's law practice will be supervised by an attorney acceptable to the Disciplinary Administrator and which will contain such other provisions as the Disciplinary Administrator shall deem appropriate.

### CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Mark A. Galloway be suspended for 2 years from the practice of law in the state of Kansas, effective on the filing of this opinion, in accordance with Supreme Court Rule 203(a)(2) (2011 Kan. Ct. R. Annot. 280).

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2011 Kan. Ct. R. Annot. 379) and Rule 219 (2011 Kan. Ct. R. Annot. 380). In complying with Rule 219, the respondent shall provide a psychological evaluation and a plan of probation, as outlined above.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas reports.