IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 118,944

In the Matter of TAMMIE E. KURTH,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed January 25, 2019. Six-month suspension.

*Kimberly Knoll*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the formal complaint for the petitioner.

*John J. Ambrosio*, of Ambrosio & Ambrosio, Chtd., of Topeka, argued the cause, and *Tammie E. Kurth*, respondent, argued the cause pro se.

PER CURIAM: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against Respondent Tammie E. Kurth of Liberal, an attorney admitted to the practice of law in Kansas in 1986.

Respondent initially entered into a diversion agreement. As a part of that agreement she stipulated to violations of Kansas Rules of Professional Conduct (KRPC) 1.3 (2018 Kan. S. Ct. R. 292) (diligence); 1.4(a) (2018 Kan. S. Ct. R. 293) (communication); 1.5(a) (2018 Kan. S. Ct. R. 294) (fees); and 1.16(d) (2018 Kan. S. Ct. R. 333) (termination of representation), as well as facts supporting those violations.

Respondent did not successfully complete the diversion, leading to its revocation. The Disciplinary Administrator's office then filed a formal complaint against Respondent, adding new allegations that she had also violated KRPC 8.4 (2018 Kan. S. Ct. R. 381)

1

(engaging in conduct that adversely reflects on a lawyer's fitness to practice law) and Supreme Court Rule 208 (2018 Kan. S. Ct. R. 246) (annual registration violation for failure to update address) during the period of time her diversion agreement was in effect.

A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys in August 2017. Respondent was personally present and was represented by counsel. The panel determined that Respondent committed the four rules violations that gave rise to the diversion, but it rejected the two new allegations. The panel drew this distinction despite Respondent's earlier statement in her answer that she admitted to the violations alleged by the Disciplinary Administrator's office.

Respondent has filed what are styled as four exceptions to the panel hearing report, but this case is not contested on the panel's factual findings or on its legal conclusions regarding the existence of the four violations. Thus this is not a conventional contested disciplinary case.

Respondent and her counsel instead take issue only with the suspension sanction recommended by a majority of the hearing panel, questioning whether, in particular, the panel's recommendation was dependent in part on a factually unsupported and legally improper evaluation by panel members of Respondent's fitness—here, meaning physical and mental capacity—to practice law. In Respondent's view, that subject would have been appropriate for consideration were this a proceeding under Supreme Court Rule 220 (2018 Kan. S. Ct. R. 267), which prescribes a particular process for dealing with lawyers who are alleged to be incapacitated; but her fitness to practice law should not influence the sanction recommended or imposed in this disciplinary matter.

FACTUAL AND PROCEDURAL BACKGROUND

In order to resolve this case, we first set out a chronological review of the pertinent facts, including those recited by the panel and additions we draw from uncontroverted portions of the record. The additions and some re-ordering of the panel's recitation are necessary for completeness and clarification.

As the panel set out, this case began with Respondent's representation of two clients, A.M. and A.O.

A.M. retained Respondent in June 2011 and agreed to pay $2,500 for representation in a divorce. A.M. paid Respondent $1,500 of the fee, and Respondent met with A.M. on one occasion. Respondent filed a petition for divorce for A.M. on July 13, 2011.

A.O. retained Respondent "to represent him in a protection from abuse case. A.O.'s mother and stepfather paid the respondent $2,500 [on July 25, 2011]. Four days later, the court dismissed the case at the request of the petitioner, A.O.'s wife, and after little work had been completed by the respondent."

Within three weeks after these events, Respondent's adult daughter was flown from southwest Kansas to receive care at a Wichita hospital. This was the second time in a few months that such emergency transport had been required. Respondent left her law practice and went to Wichita, where she remained at her daughter's bedside for the next three months.

A.M. was unable to reach Respondent by telephone or in person despite repeated attempts to do so. No action occurred in A.M.'s divorce proceeding.

Respondent's daughter died on December 6, 2011.

As the panel wrote regarding the subsequent events in A.M.'s divorce:

"On January 13, 2012, the judge scheduled a hearing for February 17, 2012. Because A.M. had not heard from the respondent and was unable to reach the respondent, she hired another attorney, Linda Gilmore. Ms. Gilmore entered her appearance on January 23, 2012. At that time, Ms. Gilmore sent the respondent a letter requesting a copy of A.M.'s file and requesting that the respondent forward the unused retainer to Ms. Gilmore. The respondent never responded to Ms. Gilmore's letter nor did she forward or refund any unearned fees."

Soon, on March 12, 2012, A.O. sent an email message to Respondent, which read:

"Tammie I was just wanting to make sure u haven't forgot about me because I have not received a bill or receipt in the mail stating how much I owe u or how much I am getting back just wanted to check and make sure u haven't forgot about me."

Respondent did not respond to A.O.'s email.

Gilmore completed the representation of A.M. by March 30, 2012.

A.O. lodged a complaint against Respondent with the Disciplinary Administrator's office on April 25, 2012. After receiving notice of A.O.'s dissatisfaction, Respondent informed the Disciplinary Administrator's office in writing that she considered the problem a fee dispute. She also described the personal difficulties that had beset her and her family:

4

"Due to my adult daughter first being life flighted to St. Francis on the date above-referenced, and ultimately being diagnosed with, and dying from, terminal illness at 33 years old on 6th of December, 2011, I literally left both my physical office and my 25-year practice on the August date referenced and have not returned, nor do I have the intention to do so, not as to my resumption (actively) of the practice of law. As can be imagined, I had numerous clients at the time of abruptest departure not possibly foreseeable; of the many active files that I had then, I readily admit by desire that there were many whom I was and remained concerned for, but yet all of whom blessed me with the exceeding graciousness to move forward in my lengthy absence without assistance of any significance from me—[A.O.] was not among those and I was surprised, understatedly, by receipt of your letter.

"I had contact with [A.O.] fairly characterized as of an ongoing nature through the date of his last e-message to me of March 12, 2012 [a copy of which is submitted herewith] and the contacts between he and I continued throughout this time period during which I remained at my daughter's bedside. His divorce which I represented him in fully to my own best and personal knowledge in the utmost of good faith and until the date of my receipt of your letter, acrimonious, though not atypically so, did involve the parties' 'state of nonlegal affairs' being ever-erratic, for a time extending beyond the typical as I then considered it based on my experience. When the time eventually came, the action settled itself by the parties' reconciliation, resulting in a case dismissal; it was then my understanding that their progress with the personal issues was of extraordinary quality such as to have very likely rendered any refiling in the future by either party of an extreme unlikelihood, which is quite atypical. So I believed, [A.O.] and I parted ways and we'd done so upon the most favorably conceivable terms, from my own viewpoint. It is without reluctance or hesitation that I advise you that I was not capable of producing, nor accordingly able to furnish, the final account billing for [A.O.]'s account; I am neither presently positioned to provide it to him, and he was previously agreeable to foregoing it entirely, but he obviously may have since changed his [mind]. It is within the same frame of mind that I'm of the clearest of both in my confidence and conscience that [A.O.] will have an outstanding balance owed on account, and as directly opposed to a positive trust balance, which existence of would unquestionably have given rise to his entitlement to payment of such overage instantly.

5

"It is with uttermost regret and apologies appropriate and proper to your office, as well as to the complainant, [A.O.], that I respond and respectfully submit this as my response of formality to the circumstances ever arising in the first instance, regardless of my personal situation and losses and his preceding concurrence with the production of a final bill being foregone. Further, I will engage in any efforts or undertake the performance of any nature of action that I am capable of and able to as necessary to either his satisfaction or achievement of directives from you [the Office of Stan Hazlett] with all expedience as I am also of capability and ability."

On July 11, 2012, A.M. lodged a complaint against Respondent with the Disciplinary Administrator's office. The Disciplinary Administrator's office sent Respondent a letter telling her that A.M.'s complaint had been docketed for investigation on July 23, 2012.

The same day, the Disciplinary Administrator's office sent Respondent a letter acknowledging her response to A.O.'s allegation and telling her that A.O.'s complaint also had been docketed for investigation.

On September 14, 2012, Nels P. Noel informed the Disciplinary Administrator's office that he would be representing Respondent with regard to A.M. and A.O. Approximately three weeks later, in October, he provided a further response to A.M.'s complaint and an initial response to A.O.'s complaint, saying Respondent represented A.O. in a divorce as well as in the PFA case. The response enclosed invoices Respondent had apparently prepared months after her representation ended. They showed A.M. owing Respondent $978 and A.O. owing Respondent $240. Noel asked the Disciplinary Administrator's office to consider Respondent as a candidate for diversion.

On December 27, 2012, Respondent sent a letter responding to an investigator's inquiry into A.M.'s complaint. The panel set out its relevant content:

6

"At the risk of drawing more attention to continuing apologies, please [accept] mine now for the belatedness of this correspondence given with full assumption of all risk. In lieu of any detailed explanations, I will simply proceed directly to address the issues of specific request (I had no intent at anytime that delay in general be considered excusable in whole or in part, or for that matter mitigable in any respect). In connection with my response, I also transmit the e-mail correspondence identified by my Assistant as having been exchanged between Steve Brooks and I regarding this matter during the period of my representation of [A.M.] of any potential pertinence to her Complaint of fair recency and related issues. It is my belief that you will find, as did I, that the mail exchange between Mr. Brooks and I, if not fully corroborative, certainly presents no conflicts regarding factual issues and/or information contrary to that which I have previously provided intermittent and in various form. As to Mrs. Gilmore's enclosure of the final billing statement prepared precedent to my contact with you for investigative purposes, I will attempt to the best of my ability to respond to each individual handwritten remark or notation upon the statement itself, and regardless of whether presented as a complete or partial sentence [I am presuming the remarks to be solely attributable in my content as well as written format to [A.M.]]; my responses will also be correspondingly chronological, as follows:

'~ msgs. WERE Left – I cannot confirm whether or not there were any voicemail messages from [A.M.] to the office for the reasons that when my Daughter's first lifeflight occurred on August 13, 2011, I did not physically returned to the office until the October billing statement was prepared, the telephone service to the office was terminated several months prior to that time and I am unaware of any ability to retrieve such messages following the termination of telephone service, if any exists; however, I have no reason to dispute [A.M.]'s apparent contention that messages were left by her in my absence subsequent to August 11, 2011;

7

'~ TERMANEtED – I do not know if [A.M.]'s reference to 'terminated' is to the phone service or my representation of her, but the term is nevertheless of non-interpretive applicability to both. However, it is my belief that the phone service to the office was terminated **after** my representation of [A.M.] had ended. Further, as the attached e-mail correspondence reflects, Mr. Brooks advised me by mail on November 21, 2011 in response to my mail of that same date not more than thirty (30) minutes in time apart that he had just spoken with his client and that *both parties **had advised him*** that they could and desired to wait any further action by me and tell such future time as my Daughter's condition permitted: My admittedly somewhat belated expression of exceeding gratitude followed on December 6, 2011 in response to Steve's coincidental inquiry of my Daughters status and/or improvement the very morning of the afternoon of her death. There were no communications exchanged between Mr. Brooks and myself thereafter until my receipt of mail from Mr. Brooks on January 16, 2012 inquiring about whether or not I had returned to work and referencing a dispute between the parties as to child support, and to which I responded that day to advise Mr. Brooks of Mother's having suffered a stroke and her own airlift to Kansas Medical Center in Andover, and Mr. Brooks replied with regrets and best wishes for my Mother. I received an additional e-mail message from Mr. Brooks on January 23, 2012 regarding the pretrial conference upcoming on February 17, 2012 and stating the specific concern that [A.M.] had informed Mr. Brooks' client that she had engaged "other counsel," but had refused to identify the counsel apparently retained and simply requesting my assistance if it was available to determine his or her identity and/or help with the resolution of the relatively straightforward issues to be resolved to finalize the case; the final e-mail that I received from Steve came two (2) days later and contained the single statement that "linda gilmore filed a motion in this u off the hook i assume." To my best knowledge and good faith belief, there were no attempts by [A.M.] to contact me, directly or indirectly, at any time following Mr. Brooks last mail as reference; I can advise that Mr. Nels Noel inquired *of me* as

8

we began our work together with utmost expediency toward the end of rectifying my oversight in failing to independently respond to this Complaint of my receipt and/or knowledge of Linda Gilmore's apparent request for the file and billing records and I responded at the time of his inquiry that I assumed that it was received by regular mail at the office, but later determined that I did not have any such documentation within the mail received in due course during my absence and so informed Mr. Noel upon this discovery.

'~ NO ANSWERS/NO RetuRN CAllS – I do not deny and, indeed, admit fully that I had no staff at the office to answer calls during the time period in question and that if calls resulted in voicemail messages, such calls were not returned, as above-discussed.

'~ PhoNg Disc – as addressed hereinabove, the phone service at the office was ultimately voluntarily terminated when my Daughter's terminal diagnosis and concomitant and prognosis was clear.

'~ Not TRuE – the two (2) words "not true" are written beneath the 8/31/2011 time entry:  I can only advise that I *did* participate in a telephone conference with Mr. Brooks upon the date set forth and that the substance of the conference was as transcribed in the time entry according to Mr. Brooks' understanding at that time.'

"~ [A.M.] states the following at the bottom of page two (2) of the billing statement, to-wit:  'She SEEmS to ONly CoRReSpoN with MR. BROOKS Not HER CliENt.' It is true that during the period of my Daughter's terminal illness, which involved two (2) lifeflights and concurrent hospitalizations at St. Francis, hospitalization at Gali[ch]ia Heart Hospital for one (1) week in November, 2011 and culmination in her death at Victoria Falls Rehabilitation and Skilled Nursing facility in Andover after admission on October 3rd and residency to her death on the 6th day of December, my ongoing communications were exclusively with Mr. Brooks. I can only respond that it was my belief that this arrangement was satisfactory to everyone involved under the

9

circumstances and that, to my best knowledge and belief, I received no written communications (by either postal mail or office e-mail, both addresses for which were furnished, as customary to all new clients, to [A.M.] at the outset of my acceptance of her representation), nor any other phone contacts (my 'years' 'long-standing' cellular number' had also been provided to [A.M.] in connection with my engagement by more recent, but even then of an historical, practice protocol with new clients) within the duration of that period in months-of-time. I can also and do apologize for these circumstances if such that the abiding belief of our communications occurring through Mr. Brooks was totally satisfactory to [A.M.] was incorrect, and wish for her to know of my humblest regrets for any hardship caused by this method of my attempts to keep current upon this matter. In retrospect, I should likely have withdrawn from it, as opposed to continuing efforts to assist with it, notwithstanding that I was unaware of any desire by [A.M.] that I do so.

"When I was hired by [A.M.] during first of June, 2011, I agreed to permit her to pay only $1,500 of the perpetually customary initial required retainer of $2,500 as a courtesy at her insistent request. I have practiced primarily family law for twenty-five (25) years and rarely do variations and deposit requirements occur discretionally, only as was the case with [A.M.] I mention this only as relevant to my actions during the time period in question under the circumstances. Had circumstances been of normalcy, I would have withdrawn solely for lack of supplementation of the deposit; under the entirety of the circumstances, it appears and retrospective that my efforts of perceived accommodation in the continuation of [A.M.'s] representation especially given my situation quite possibly contravened the interests of all concerned. Regardless, I once again apologize for my part in any of the developments which may have ultimately resulted in the filing of this Complaint by [A.M.]

". . . I have obviously done nothing by this correspondence aside from addressing [A.M.'s] notations as restrictively responsive. I have no familiarity with any protocol which you may have in place for the investigation of matters of assignment to you; neither do I have any particular desire for specific performance of any tasks related to your self-satisfactory completion of this matter's investigation the only manner in which I am capable of expressing my

10

concluding observations is to simply advise you that, unless you are opposed to a personal interview *or alternatively* should you complete your review of this matter as you deem appropriate and your conclusions eliminate my commission of wrongdoing or acts of unethical genre, I would most respectfully and only then deem necessarily request that we conduct an in-person conference at some point prior to your report(s) submission to Stan Hazlett upon any date, at any location and at any time of very least inconvenience to you; the reason(s) for this conditional request are that the information and materials which have thus far been made available to you in connection with this matter constitute not more than superficial surface of complicated issues and entanglements of stunning 'convoluted and surreal issues' in areas ranging from mental health to professional legal misconduct by others who are not now and may or not yet be, the subject of investigative processes themselves; additionally, the existence of judicial improprieties which have been presented, reviewed and summarily dismissed in which my late Daughter was particularly without my knowledge at the behest of her acting appointed trial counsel, which my own involvement followed months prior to her illness and finally which {was recently revisited with the same result of summary dismissal notwithstanding that I personally and professionally witnessed a significant portion of these matters eventually officially reported, but with the remainder of largess having been disclosed to me and my late Daughter gradually by piecemeal throughout his representation of her from his own personal knowledge to which neither of us were privy}. If nothing else, should you wish to devote time of limitation to clarification of this final paragraph and the events to which I refer, I would willingly participate as you deem proper in your sole discretion. Thank you very much for your patience, understanding, consideration and support to date in connection with these matters and, in addition, in advance for the assistance of finalization with disposition which is certain to be of your commitment and ownership."

By early May 2014, the investigations of the complaints lodged by A.M. and A.O were complete and the disciplinary Review Committee had determined that there was probable cause to support allegations that Respondent violated KRPC, 1.3, 1.4, and 1.5.

11

The letter sent by the Disciplinary Administrator's office to inform Respondent of the Review Committee's determination did not mention KRPC 1.16. The Review Committee had recommended informal admonishment or diversion.

In a letter received by the Disciplinary Administrator on June 9, 2014, Noel sought to have Respondent placed on diversion.

In the summer of 2014, disputes developed between Respondent and her husband and third parties. The panel described the events that followed:

"In June, 2014, the respondent and her husband had a dispute with B.L.H.-L., an individual who had been storing a vehicle for the respondent and her husband. The respondent initiated a lawsuit against B.L.H.-L. on June 30, 2014, by fax filing a petition. On July 30, 2014, the respondent sent *via* facsimile a hand-written amended petition to the District Court of Stevens County. Excerpts from the document include:

'To Office of Clerk, District Court, State of Kansas

'Attn: Sunshine Times two (2) #2

'Helloooooo?! I am a fax coversheet. I contain me, plus four (4) additional pages attached to me. Note: NONE are for direct filing; ALL will be followed this p.m. or early a.m. by the Amended Petition to-be-filed, in addition to above: Request for Summonses to issue in THIS CASE subsequent to filing of Amended Petition; and Indigency Affidavit.

'From: MeMeMeMeMeMeMe???????

. . . .

'See Also attached letter transmitted! first prior to this to you two (U2) . . . . XOXO?! and page copied from cases FILED HERE {all three were filed in June of 2012, A.D.} *for the actual physical street address for use by the Fargo, S.D. S.O. for service on [illegible] B.L. Lee is to be served here; if is different "on tha' back- [illegible] I'll contact you timliest [*sic*]'"

In the panel's words, "The [handwritten] document [was] difficult to read and understand." It continued:

"In July, 2014, the respondent and her husband also had a dispute with an auto repair shop. The respondent filed suit on behalf of her husband and herself. In the action, the respondent filed a hand-written document, titled, 'First Exhibit Supplemental to Petition,' on July 21, 2014."

Again, in the panel's words, the "document [was] difficult to read and understand."

Noel informed the Disciplinary Administrator's office on August 6, 2014, that he was no longer representing Respondent. Within days, the Disciplinary Administrator received a copy of the diversion agreement signed by Respondent. An August 12, 2014, letter sending the fully executed agreement to Respondent stated that it contemplated Respondent would not practice law and that she would transfer to inactive status. If Respondent instead intended to practice, the letter said, she would need an attorney who agreed to supervise her practice. The panel described certain of the diversion agreement's other relevant provisions:

"In the diversion agreement, the respondent stipulated that she had not been practicing law for a period of time and that she did not intend to resume her practice. The respondent stipulated that she violated KRPC 1.3, KRPC 1.4, KRPC 1.5, and KRPC 1.16. Finally, the respondent agreed to comply with a number of conditions, including:

13

'Upon signing the Diversion Agreement, the Respondent agrees to resolve the fee dispute with [A.O.] by submitting the matter to the Kansas Bar Association Fee Dispute Committee. The Respondent agrees to comply with the decision reached by that committee.

. . . .

'Should Respondent return to the practice, the Respondent's practice will be supervised by [an] attorney that will be named at that time, who is located in a geographically convenient location.'

"Further, in the diversion agreement, the respondent agreed that should she fail to comply with the terms and conditions of diversion, the factual stipulation and the rule violations outlined in the agreement would be introduced into evidence at a hearing held in this matter."

There is nothing in the record that explains how or when a KRPC 1.16 violation was added to the list of Respondent's violations.

On September 24, 2014, Respondent was administratively suspended from practice for failure to pay an attorney registration late fee. She was reinstated on November 7, 2014, after she paid the fee.

Despite efforts by the Respondent, the Disciplinary Administrator's office, and the director of the Kansas Lawyers Assistance Program (KALAP), neither a practice supervisor nor a KALAP monitor was found to assist Respondent. And, in November and December 2014, the Disciplinary Administrator's office wrote to Respondent, warning that she did not appear to be in compliance with her diversion agreement, because she did not have a practice supervisor and was filing pleadings in the two cases in which she and her husband were plaintiffs. Respondent did not answer these two letters from the

14

Disciplinary Administrator's office, which were mailed to two addresses she supplied on her annual attorney registration form that were different from a third address on the form. The third address had also been provided in two letters Noel had sent to the Disciplinary Administrator's office.

The Disciplinary Administrator's office followed up with two more letters to Respondent in March 2015. The first informed her that a new disciplinary complaint had been docketed as a result of her failure to respond to the November and December 2014 letters about the cases in which she and her husband were plaintiffs. The second told her that the Review Committee had revoked her diversion arising from the complaints lodged by A.M. and A.O. and had directed the Disciplinary Administrator to pursue formal charges on those issues.

One of the cases in which Respondent and her husband were plaintiffs was dismissed with prejudice in April 2015 after the parties settled their differences.

On May 4, 2015, Respondent sent a fax to the investigator on the cases in which she and her husband were plaintiffs, saying that she had not received the November and December 2014 letters.

The December 2014 letter the Disciplinary Administrator's office had sent to Respondent was eventually returned through the postal service, and, on May 7, 2015, an investigator looked into the address problem and apparently resolved it.

On May 26, 2015, Respondent sent a second fax to the investigator addressing the two cases in which she and her husband were plaintiffs. In the fax, Respondent said the two cases were filed pro se, that she believed the diversion agreement required her to have a practice supervisor only for representation of third parties (apparently other than

15

her spouse), that she had not returned to the practice of law since her daughter's death in December 2011, and that she was suffering from a worsening shoulder condition that caused her extreme pain and had prevented her from proceeding with an anticipated meeting with the director of KALAP.

On July 22, 2015, the second of the two cases in which Respondent and her husband were plaintiffs ended when a journal entry memorializing a settlement agreement between the parties was filed.

In March of 2016, the Disciplinary Administrator sought an independent mental health evaluation of Respondent under Supreme Court Rule 220. This court granted the Disciplinary Administrator's petition for the evaluation, and Respondent was evaluated by psychologist Carolyn L. Huddleston. Huddleston concluded that Respondent was fit to practice law, despite her grief from her daughter's death and other traumatic events in her life. Given the result of the evaluation, Respondent was not eligible for transfer to disability inactive status at that time.

On December 1, 2016, Respondent's current counsel, John J. Ambrosio, entered his appearance in this disciplinary proceeding. The filing of the Formal Complaint, Respondent's Answer, and the panel hearing followed.

At the hearing on August 15, 2017, Huddleston again generally supported Respondent's ability to practice law, although she expressed concerns about Respondent's doses of prescription drugs to treat her physical and mental health issues and said they could cause confusion.

Testimony from Douglas L. Geenens, Respondent's psychiatrist, did not support Respondent's ability to practice law. Geenens had been treating Respondent since 2009;

16

her diagnoses were "major depression, posttraumatic stress disorder, dysthymia which is a form of lower grade depression that's more chronic, panic disorder, [and] chronic pain related issues." Geenens described Respondent's daughter's death as an "immobilizing trauma" for her, compounded by Respondent's loss of her daughter's children, who were taken out of state by their fathers after their mother's death.

Geenens also detailed the medications he had prescribed for Respondent and said that they could be "somewhat sedating, potentially cognitively dulling" and could cause problems for Respondent practicing law. He said:

> "It wouldn't be an absolute no because some people are able to function on these types of medications. It would be difficult, in my opinion, to practice law on these medications the way they are currently taken, the way they are currently dosed, yes."

Geenens believed Respondent would eventually "reach a period of emotional [stability] and have worked through the grief and loss of her daughter and grandchildren." At that point, the dosages of the drugs Respondent was taking could be reduced over three to six months, enabling Respondent's practice of law to become possible. But Geenens did not think Respondent was at that point yet. He continued:

> "And I think [respondent] would agree with me that given everything that she's been through, her physical and mental issues, I don't think either one of us would say that she's capable today of practicing law. We've got much work to do for her physical and mental stability to get her through the grief process. It would certainly be my hope that she has the capacity to practice law at some point in the future, but today is not that day."

When Respondent testified at the hearing, the panel asked her whether she believed she was currently able to practice law and inquired about the prescription drugs she was taking. Respondent said she did not believe that the medications would cause a

17

problem with her return to practice law, although she acknowledged that she would "have to work around them to some extent." She also said that her chronic shoulder pain was likely to cause more issues in law practice than her prescription drugs would. One of the panel members specifically asked Respondent what medications she had taken the day of the hearing and the night before, and Respondent described her consumption of Xanax, a maximum dose of sleeping pills, Dilaudid, and Adderall.

During closing arguments, the Disciplinary Administrator's office sought a 6-month suspension with a requirement for a Rule 219(d) reinstatement hearing. The deputy representing the office briefly mentioned the alleged KRPC 8.4 and Rule 208 violations but did not argue in any meaningful way that the evidence before the panel supported them.

Counsel for Respondent began his closing argument by characterizing the rules violations that gave rise to the diversion as relatively minor, warranting only an informal admonition. He then said that the question before the panel was: "[D]oes she have the wherewithal to practice law?" When asked by the presiding panel member if the panel could consider what that panel member perceived as Respondent's confusion during the hearing, counsel said yes. But then he said that the question was whether Respondent was "confused because of stress, . . . confused because of the PTSD, . . . confused because this is an awful process." Counsel did not say why the reason for any confusion was relevant. Another member of the panel then sought clarification of counsel's position, and he said the panel member was correct in describing the position in three parts: (1) the diversion violations were minor; (2) any issues about Respondent's competence to practice law had arisen after those violations; and, (3) as a matter of law, the panel should not address any competence to practice or lack thereof. Counsel conceded that he could cite the panel to no law supporting the third proposition; and his closing argument had repeatedly emphasized that Respondent might communicate differently or act or dress differently

18

from other lawyers, but that such differences should not affect an evaluation of her capability to practice law.

The panel issued its Final Hearing Report on February 9, 2018. The panel made a finding of fact that "respondent failed to comply with the terms and conditions of the diversion agreement by continuing to practice law without first securing a practice supervisor." Based on this finding of fact and Respondent's stipulation in the diversion agreement, the panel concluded that Respondent violated KRPC 1.3 (diligence), 1.4 (communication), 1.5 (fees), and 1.16 (termination of representation). It also stated:

> "Further, had allegations relating to [respondent's handwritten court filings] been included in the formal complaint, the hearing panel would have found that the respondent also violated KRPC 1.1 (competence). However, because information regarding those submissions was not included in the formal complaint, the hearing panel makes no conclusions in this regard."

The panel also concluded that clear and convincing evidence was not presented to establish that Respondent violated KRPC 8.4 or Rule 208. It set forth the following in its conclusions of law:

"KRPC 1.3

> "38. Attorneys must act with reasonable diligence and promptness in representing their clients. *See* KRPC 1.3. In the diversion agreement, the respondent stipulated that she failed to diligently and promptly represent A.M. in a divorce case. In that case, after filing the petition the respondent did not diligently represent A.M. Because the respondent failed to act with reasonable diligence and promptness in representing her client, the hearing panel concludes that the respondent violated KRPC 1.3.

19

## "KRPC 1.4

"39.      KRPC 1.4(a) provides that '[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.' The respondent stipulated that she violated KRPC 1.4(a) when she failed to return A.O. and A.M.'s telephone calls in the diversion agreement. While the respondent provided some evidence that she communicated with opposing counsel in A.M.'s case, the rules require[] the respondent to maintain adequate contact with her client. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.4(a).

## "KRPC 1.5

"40.      The fees charged by attorneys must be reasonable. KRPC 1.5(a). A.O. paid the respondent $2,500 to defend him in a protection from abuse suit filed by his wife. Four days after she filed the petition and not as the result of the respondent's representation, A.O.'s wife voluntarily dismissed the petition.

"41.      In the diversion agreement, the respondent stipulated that she violated KRPC 1.5. However, the respondent also claims that she earned the $2,500 and more. To support the respondent's claim that she earned the $2,500 fee, the respondent provided an invoice constructed well after the representation ended. The hearing panel finds the respondent's invoice to be unreliable because it was not made contemporaneously. Because the case was resolved so quickly, because the case was resolved by the parties rather than by the respondent, and because the respondent stipulated that she violated KRPC 1.5, in the diversion agreement, the hearing panel concludes that $2,500 was an unreasonable fee in violation of KRPC 1.5.

## "KRPC 1.16

"42.      KRPC 1.16 requires lawyers to take certain steps to protect clients after the representation has been terminated. Specifically, KRPC 1.16(d) provides the requirement in this regard:

20

'Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.'

Despite the respondent's stipulation that she violated KRPC 1.16 in the diversion agreement, the respondent asserts that she earned the fees paid on behalf of A.O. and by A.M. However, to establish that she earned the fees paid, the respondent relied on invoices constructed well after the time the services were rendered. Because the invoices were not contemporaneously made, the hearing panel finds that respondent's evidence in this regard to be unreliable. Based on the respondent's stipulation in the diversion agreement, the hearing panel concludes that the respondent violated KRPC 1.16(d) by failing to refund unearned fees."

The panel then turned to an examination of American Bar Association Standards for Imposing Lawyer Sanctions and said:

"43. . . . Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"44.     *Duty Violated*. The respondent violated her duty to her clients to provide diligent representation and adequate communication. The respondent also violated her duty to her clients to refund an[y] unearned fees.

"45.     *Mental State*. The respondent knowingly violated her duties.

"46.     *Injury*. As a result of the respondent's misconduct, the respondent caused actual injury to her clients.

21

"47.     *Aggravating and Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

a.      A Pattern of Misconduct. Because the respondent failed to adequately communicate with two clients over a period of time, the hearing panel concludes that the respondent engaged in a pattern of misconduct.

b.      Vulnerability of Victim. A.O. and A.M. were vulnerable to the respondent's misconduct.

c.      Substantial Experience in the Practice of Law. The Kansas Supreme Court admitted the respondent to practice law in the [s]tate of Kansas in 1986. At the time of the misconduct, the respondent had been practicing law for more than 25 years.

d.      Indifference to Making Restitution. In the diversion agreement, the respondent agreed to submit the dispute with A.O. regarding the fee paid to a fee dispute committee. Unfortunately, the fee dispute committee dissolved and the respondent was unable to submit the matter to the committee for consideration. After the fee dispute committee dissolved, however, the respondent took no action to resolve the dispute with A.O. Additionally, the respondent has not taken any steps to provide A.O. with any restitution. Accordingly, the hearing panel concludes that the respondent is indifferent to making restitution to A.O.

e.      Failure to Complete the Attorney Diversion Program. Rule 203(d)(2)(vii) provides:

'If the Respondent fails to complete the agreed tasks in a timely manner at any point in the diversion process, he or she may be terminated from the program. If such a termination occurs, traditional formal disciplinary procedures will resume. **When the complaint is returned to the formal**

22

**disciplinary process, the Respondent's termination from the Attorney Diversion Program may be cited as an additional aggravating factor** in recommending discipline and as a violation of Supreme Court Rule 207 and KRPC 8.1.' (Emphasis added.)

The respondent's misconduct in this case is aggravated by her failure to timely complete the diversion agreement.

"48.     Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

a.      <u>Absence of a Dishonest or Selfish Motive</u>. The respondent's misconduct does not appear to have been motivated by dishonesty or selfishness.

b.      <u>Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct</u>. The respondent has endured terrible tragedies during the past seven years. The respondent's psychiatrist, Douglas L. Geenens, D.O., testified that he diagnosed the respondent with major depression, post-traumatic stress disorder, dysthymia, and panic disorder. Additionally, the respondent suffers from chronic pain. Dr. Geenens detailed the prescription medications which the respondent currently takes. He testified that the medications are 'somewhat sedating, potentially cognitive dulling.' The hearing panel observed cognitive impairment greater than the 'cognitive dulling' described by Dr. Geenens. The respondent's personal and emotional problems certainly contributed to the respondent's violations of the rules.

c.      <u>The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions</u>. The respondent fully cooperated with the disciplinary

process. Additionally, the respondent admitted many of the facts that gave rise to the violations.

d.        Remorse. In her responses to the complaint and at the hearing on this matter, the respondent expressed genuine remorse for having engaged in the misconduct.

e.        In addition to the mitigating factors considered above, the Court has recognized that a mental disability is a mitigating factor when certain factors are present. Those factors are:

(1)        there is medical evidence that the respondent is affected by a chemical dependency or mental disability;

(2)        the chemical dependency or mental disability caused the misconduct;

(3)        the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and

(4)        the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

When this mitigating factor is present, it is a compelling mitigating factor. Before analyzing the four factors above, the hearing panel acknowledges the expert report introduced by the respondent in this case. The hearing panel notes that Dr. Huddleston's inquiry into whether the respondent's license should be transferred to disability inactive status while relevant evidence is based on a different standard than the mitigating factor regarding mental disability. In this case, the respondent presented sufficient evidence to establish that she is affected by a mental disability. It also appears that the mental disability may have been one cause of the misconduct in this case. However, the respondent has not demonstrated a meaningful and sustained period of successful

24

rehabilitation or recovery. Dr. Geenens testified that given the doses of the medications that the respondent currently takes, it would be difficult to practice law. Also, the respondent has likewise not demonstrated a recovery which might arrest future misconduct, or that the recurrence of the misconduct is unlikely. Because the respondent has not demonstrated sustained recovery and has not demonstrated that the recurrence of the misconduct is unlikely, the hearing panel concludes that the respondent failed to establish the factors necessary to find this factor in mitigation.

"49. In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.12 Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

'4.42 Suspension is generally appropriate when:

(a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or

(b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.'"

The panel then set out the parties' arguments on sanctions, noting that counsel for the Respondent argued it would be inappropriate "for the hearing panel to determine whether [Respondent] is fit to practice law." The Final Hearing Report continued:

"52. The hearing panel's first charge is to consider whether the disciplinary administrator established clear and convincing evidence to support the allegations in the formal complaint. The hearing panel concluded that the disciplinary administrator presented clear and convincing evidence to support violations of KRPC 1.3, KRPC 1.4,

25

KRPC 1.5, and KRPC 1.16. The hearing panel's second responsibility is to apply the ABA Standards to the facts and the rule violations and make a recommendation to the Kansas Supreme Court for discipline.

"53.     The hearing panel commends the respondent for seeking and obtaining mental health treatment. Further, the hearing panel recommends that the respondent continue with her treatment until she is released by her treatment professional. However, a majority of the hearing panel disagrees with [the] argument [of respondent's counsel] that it is not appropriate for the hearing panel to consider whether the respondent appears competent to practice law. *A majority of the hearing panel concludes that its recommendation should be based, in part, upon consideration of whether the respondent's violations and her conduct at the hearing and in the disciplinary process establish the present ability to provide competent representation to clients.* As stated in the Preamble to Supreme Court Rule 226:

> 'The profession has a responsibility to assure that its regulations are conceived in the public interest and not in furtherance of parochial or self-interested concerns of the bar. Every lawyer is responsible for observance of the Rules of Professional Conduct. A lawyer should also aid in securing their observance by other lawyers. Neglect of these responsibilities compromises the independence of the profession and the public interest which it serves.'

"54.     The overriding purpose of the disciplinary system is the protection of the public. *See In re Pistotnik*, 254 Kan. 294, 304 (1993). A majority of the hearing panel concludes that protecting the public from lawyers presently unable to provide competent representation must be part of the equation. *See In re Giovanazzi v. State Bar*, 28 Cal. 3d 465, 169 Cal. Rptr. 581 (1980) ('In arriving at a proper discipline consistent with the purpose of disciplinary proceedings to protect the public from attorneys unfit to practice [*see* Schultz v. State Bar (1975) 15 Cal.3d 799, 803, 126 Cal. Rptr. 232, 543 P.2d 600], we must balance all relevant factors including mitigating circumstances on a case-to-case basis.').

26

"55.    In considering the respondent's fitness to practice law, the hearing panel considered Dr. Geenens' opinions, Dr. Huddleston's opinions, the respondent's hand-written pleadings filed in the summer of 2014, the respondent's other communications, and the hearing panel's observations during the hearing. Dr. Huddleston's opinions belie the respondent's disciplinary responses and the handwritten pleadings. Moreover, a majority of the hearing panel concluded that the respondent's conduct at the hearing demonstrated cognitive impairment sufficient to imperil the competent representation of a client. *A majority of the hearing panel concludes that the respondent is not presently capable of providing that knowledge, skill, thoroughness, and preparation reasonably necessary to competently represent clients. Protection of the public must be considered when making a recommendation for discipline.*" (Emphases added.)

The Final Hearing Report then outlined the panel's recommended sanction:

"56.    In applying the ABA Standards to this case, the hearing panel is particularly mindful of the injury suffered by the respondent's clients as well as the significant mitigating evidence presented on behalf of the respondent. The hearing panel is genuinely sympathetic for the respondent's personal tragedies the respondent has endured during the past seven years, including the untimely death of her daughter followed by her mother's illness. However, based on all the evidence present, the hearing panel concludes that a suspension is warranted in this case.

"57.    Accordingly, based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent be suspended for a period of two years. The hearing panel further recommends that prior to reinstatement, the respondent be required to undergo a hearing pursuant to Rule 219. The hearing panel recommends that the respondent be required to undergo a hearing pursuant to Rule 219, in part, because the respondent has been out of the active practice [of law] for more than six years. At the Rule 219 hearing, to establish that the factors detailed in Rule 219(d)(4) weigh in favor of the respondent's reinstatement, the hearing panel recommends that the respondent be required to present testimony from her treatment professional regarding her compliance with the treatment plan."

27

The presiding panel member concurred in the Final Hearing Report, writing that she joined the majority's findings of fact, conclusions of law, and recommendation for discipline. But she disagreed with the majority's decision

"that it is for the hearing panel to determine whether the respondent is unfit to practice law. While the hearing panel was in a position to observe the respondent's conduct during the hearing, the hearing panel is not trained to determine fitness. Observation[] of the respondent's conduct during a hearing is not a sufficient basis to determine fitness. . . .

" . . . Further I do not join in the majority's conclusion that it is appropriate to consider whether the respondent is unfit in recommending discipline. The Rules Relating to the Discipline of Attorneys do not provide hearing panels with the authority to consider the respondent's fitness in making a recommendation for discipline.

" . . . The Rules Relating to the Discipline of Attorneys provide for the transfer of a lawyer's license to disability inactive status under certain circumstances. In this case, the Supreme Court ordered the respondent to submit to an evaluation, the respondent submitted to the evaluation, and the evaluator concluded that the respondent's license should not be transferred to disability inactive status. While Dr. Huddleston's conclusions do not square with the hearing panel's observations, *the hearing panel was not presented with evidence, other than the respondent's conduct during the hearing, to dispute Dr. Huddleston's conclusions*." (Emphasis added.)

Respondent's timely exceptions to the panel's report under Rule 212 read in pertinent part:

"2. . . . Respondent takes exception to the recommended discipline of suspension for a period of two (2) years. Respondent submits this factual determination was against the clear weight of the evidence and the recommendation of the Disciplinary

28

Administrator. Respondent takes exception to the requirement that she appear at a reinstatement hearing pursuant to Rule 219 at the conclusion of her suspension[.]

"3. Respondent takes exception to the determination that she is unfit to practice law. The proceeding[] before the board is not the proper forum for a determination of unfitness. Nowhere in the rules of discipline does it provide that the Board is charged with or allowed to make such a determination. A determination of unfitness is addressed in Supreme Court Rule 220 which provides a procedure for the determination that an attorney is incapacitated and the subsequent placement of that attorney on disability inactive status. Rule 220 provides for procedures, notice and due process requirements in making such a determination. This due process was not afforded Respondent in the panel hearing before the Board of Discipline. If a determination of unfitness is to be made, it must be made under Rule 220, not within a hearing wherein the formal complaint alleges rule violations pursuant to the Kansas Rules of Professional Conduct.

"4. Respondent takes exception to the factual determination made by the Board that she is unfit to practice law. Respondent submits this factual determination was made against the weight of the evidence. The only evidence before the Board as to this issue was presented by Dr. Huddleston. Testimony from Dr. Huddleston indicated the Respondent underwent an evaluation, as ordered by the Supreme Court, and the results of the evaluation did not indicate the need to transfer the Respondent to disability inactive status. Respondent submits that the Board improperly substituted its judgment for that of the professional witness and the clear weight of the evidence presented.

"5. Respondent takes exception to the determination by the Board that their finding of unfitness is a proper factor in the analysis of the appropriate discipline to be imposed. The Supreme Court rules do not allow for such a determination to be made or considered in imposing discipline."

Respondent's brief to this court recited her version of the testimony of the witnesses at the panel hearing. It did not include Geenens' statement that Respondent was not currently able to practice in its Statement of Facts, and its discussion of the sanction

29

to be imposed inaccurately reported that Geenens had testified the process of decreasing Respondent's prescription medication dosages had already begun. Respondent's brief argued that her mental state for the admitted violations was negligent rather than knowing. She also challenged the panel's discussion of aggravating and mitigating factors, characterizing her violations as isolated rather than a pattern and describing A.M. and A.O. as no more vulnerable than any other client. Although Respondent admitted that she did not complete her diversion and that such a failure may be an aggravator under Kansas Supreme Court Rule 203(d)(2)(vii), she argued that her actions without a practice supervisor in place were largely attributable to her location in a sparsely populated region of the state. Regarding mitigators, Respondent argued that the panel should also have considered her lack of prior discipline and that her personal and emotional problems should be counted as "overwhelming" and weigh heavily in the court's choice of sanction.

On that choice, Respondent's brief advocated for informal admonition only. If, instead, the court would choose to suspend Respondent, she argued that a six-month time period would be sufficient, given her long practice without disciplinary issues, the trauma she had suffered, and her voluntary cessation of practice after her diversion was revoked.

Respondent's brief also argued that a Rule 219 reinstatement hearing should not be required. She relied on Supreme Court Rule 219(c)(1), which covers cases in which a definite period of suspension has been ordered without specification of the requirement of a reinstatement hearing. She argued that reinstatement under that rule still would not be permitted unless the Disciplinary Administrator had certified that the attorney fully complied with all orders and conditions of the Supreme Court. This, in Respondent's view, would be an adequate safeguard for the public.

Finally, Respondent argued in her brief that the majority of the hearing panel overstepped its legal bounds and the weight of all of the evidence by determining

30

Respondent's fitness to practice. "While fitness to practice issues that are addressed by the evidence may be considered in recommending discipline to be imposed, the Hearing Panel does not have the authority to make a final determination that an attorney is unfit to practice law." In Respondent's view, Rule 220 alone is intended to address a lawyer's physical or mental capacity to practice; its procedures deviate from those applicable to disciplinary proceedings; and the Rule 220 procedure was not followed in this case. The panel could not "improperly substitute[]" its judgment for that of the professional witnesses.

The brief from the Disciplinary Administrator's office spent only three pages on argument supporting suspension with a requirement of a Rule 219(d) reinstatement hearing. It emphasized Huddleston's reservations about Respondent's medications but admitted she generally supported Respondent's emotional ability to practice law. The brief also stressed that, although Geenens' testimony supported Respondent's ability to practice law at some indefinite point in the future, her medication dosages would need to be reduced first. The brief asserted that a Rule 219(d) reinstatement hearing ordered by this court would provide a vehicle for obtaining an updated professional evaluation and ensuring Respondent's good health before clients were placed in jeopardy. Finally, the Disciplinary Administrator's office asserted that every disciplinary panel, in some measure, was charged with determining a lawyer's fitness to practice law; and it pointed to the apparently broad definition of "fitness" in KRPC 8.4(b), which deals with professional misconduct by a lawyer who commits a "criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects."

At oral argument before this court, the deputy representing the Disciplinary Administrator's office continued to seek a six-month suspension with a requirement of a Rule 219(d) reinstatement hearing. She conceded that the panel's recommendation of a two-year suspension with a required reinstatement hearing was influenced by the

majority of the panel's assessment of Respondent's incapacity to practice law. But, in response to questions from the bench, she said the issue raised by Respondent on the breadth of an ethics panel's authority to determine capacity to practice need not be settled in this case; the four violations underlying Respondent's diversion merited a sanction of suspension, and Respondent's reliance on physical and mental health problems to explain her unethical behavior merited a court order requiring a Rule 219 reinstatement hearing.

Respondent's counsel changed his sanction recommendation at oral argument—apparently with Respondent's assent—seeking published censure rather than informal admonition. He insisted that the four violations that gave rise to the diversion were so insignificant that they would never have justified a suspension and that the panel had recommended the sanction it did only because its members were put off by Respondent's unconventional appearance and meandering communication style. Questions from the bench forced him to admit that Geenens clearly did not believe Respondent was capable of practicing law immediately. They also forced him to admit that he could point to no facts in the record supporting his opinion that panel members discriminated against his nonconforming client. And he eventually volunteered—again, without reference to the record—that he and the deputy from the Disciplinary Administrator's office considered seeking a new Rule 220 capacity proceeding for his client. The deputy had already said during her oral argument that Geenens' testimony at the panel hearing would have supported a new Rule 220 petition, which can be filed at any time, even in the middle of such a hearing.

Respondent also addressed the court at oral argument. Her presentation included the information that she had approximately 200 open files at the time her daughter was

flown to the hospital in Wichita. She also discussed her continuing grief from her daughter's death and her ongoing physical and mental health challenges.

DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, the discipline that should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2018 Kan. Ct. R. Annot. 251). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent's exceptions to the hearing panel's report and her subsequent arguments in her brief and orally before this court have been described above. As mentioned, she does not contest the facts underlying violations of KRPC 1.3, 1.4, 1.5, and 1.16; nor does she contest the panel's conclusions that those facts support conclusions that she violated each of those rules. We have reviewed those facts and conclusions and hereby adopt them.

We do not address the two additional rule violation allegations the panel rejected or the panel's comment in its report about whether this case may have been appropriate for a KRPC 1.1 competence charge. That said, we have no hesitation in rejecting Respondent's counsel's repeated minimization of the seriousness of the misconduct underlying Respondent's KRPC 1.3, 1.4, 1.5, and 1.16 violations. Respondent has never denied that she essentially abandoned her practice when her daughter was transported to the hospital in Wichita in August 2011. She reported to this court at oral argument that

33

she had about 200 open files at that point, and she has described how nearly all of her clients were able to wait for her or were amenable to assistance from others. Neither of these options worked out for A.M. and A.O., whose efforts to contact the Respondent were thwarted by what even she has described as the "abrupt" shuttering of her office and failure to monitor incoming mail and telephone calls. The responsibility for these problems, despite Respondent's tragic circumstances, rests on her shoulders, not on the clients'.

The only remaining issue is the appropriate discipline for Respondent's violations. We address each of Respondent's disagreements with the panel and the Disciplinary Administrator's office on this issue in turn.

Respondent now seeks published censure rather than suspension for either the six months recommended by the Disciplinary Administrator's office or the two years recommended by the panel. Her counsel did not explain the shift in position, continuing to assert that a suspension is too serious for the violations and that it goes against the clear weight of the evidence. We have already rejected his hearty but unconvincing dismissal of the violations as minor.

We also do not accept that suspension would be inconsistent with the evidence. Regarding Respondent's mental state, although we certainly understand that Respondent was highly distraught over her daughter's health emergency, we hold that the panel was correct in assessing her violations as knowing rather than merely negligent. Her efforts to ameliorate her other clients' damage from virtually overnight closure of her practice demonstrate that she appreciated the peril in which the closure placed all of her clients, including A.M. and A.O.

As to aggravating and mitigating factors, we accept that A.M. and A.O. may have been no more vulnerable than any layperson in seek of legal advice and representation, and we further accept that Respondent should be given credit for her previously spotless disciplinary record. We nevertheless agree with the panel that Respondent's violations formed a pattern of disregard for A.M.'s and A.O.'s need to hear from her in a timely way about the status of their legal matters and the amounts they were to be charged for Respondent's services. Respondent also admits that she failed to complete her diversion, seeking lenience on that aggravator because of the scarcity of practice supervisors in rural Kansas. Even if we assume such scarcity, Respondent could have sought to be excused from her commitment not to practice without a supervisor. Instead she elected to continue two lawsuits on behalf of her husband as his counsel. Indeed, she still does not seem to grasp that this representation was a departure from her diversion commitment not to practice law. Her assertion that the director of KALAP and the deputy in the Disciplinary Administrator's office approved of her court filings in this period was forcefully denied.

This brings us to the mitigator for personal and emotional problems if such misfortunes have contributed to violations. There can be little doubt that the illness and death of Respondent's daughter and Respondent's other physical and mental problems contributed to her ethical violations. Yet, to the extent she now attempts to rely on pre-existing or subsequent chemical dependency or mental disability as mitigating, she has problems with evidentiary support of the last two of the four factors set out in the panel report: sustained recovery and unlikeliness of recurrence of misconduct.

Contrary to the at least incomplete representation in Respondent's brief and the incorrect description in the concurrence of the panel chair, Huddleston's original opinion supportive of Respondent's emotional fitness to practice, rendered during the 2016 Rule 220 proceeding, was far from uncontroverted at the panel hearing. Huddleston herself expressed some uncertainty when confronted with new information about Respondent's

use of prescription medications during the hearing. And Geenens was both less equivocal and less supportive of the idea that Respondent had recovered from her trauma or resulting problems. He said flatly that Respondent could practice law again someday but not yet, not until her chronic shoulder pain and other issues could be managed with smaller drug doses achieved incrementally over several months.

Thus the actual content of Huddleston's and Geenen's testimonies before the panel tended to highlight the logical disconnect in Respondent's arguments on this mitigator and the related question of fitness to practice. As her counsel conceded at oral argument, she cannot be simultaneously so ill that her misconduct should be treated lightly and so well that she should be welcomed back to law practice without a period of suspension and a Rule 219(d) reinstatement hearing. Counsel, who has represented many of his fellow lawyers in disciplinary proceedings for many years, is certainly familiar with this court's broad authority under Supreme Court Rule 203(a) (2018 Kan. S. Ct. R. 234) to require any condition of law practice, "which the Supreme Court deems appropriate." And a Rule 219 reinstatement hearing explicitly contemplates an attorney being required to establish that he or she is ready to practice again after suffering from any infirmity. See Rule 219(d)(4)(J) (at reinstatement hearing, attorney must establish that he, she "has received adequate treatment and/or rehabilitation for any substance abuse, infirmity, or problem"). In conformity with these rules, this court has regularly employed reinstatement hearings to ensure that a sustained period of recovery has been achieved and that it is likely to have arrested any misconduct to which it contributed. See *In re Rittmaster*, 299 Kan. 804, 817, 326 P.3d 376 (2014) (reinstatement hearing; Respondent required to establish receipt of "adequate mental health treatment to render her capable of engaging in the active practice of law"); *In re Bowman*, 298 Kan. 231, 245, 310 P.3d 1054 (2013) (at reinstatement hearing, Respondent required to provide written report of psychiatric, psychological, or social work professional that includes opinion of no current impediments to ability to practice law); *In re Galloway*, 296 Kan. 406, 413-14, 293 P.3d

36

696 (2013) (at reinstatement hearing, Respondent required to present "psychological evaluation that addresses whether respondent suffers from any condition that would impede his ability to practice law effectively").

In addition, as discussed with counsel at oral argument, this court is not bound by the sanction recommendation of any other participant in the disciplinary process. A hearing panel's recommendations are advisory only and do not prevent the court from imposing greater or lesser sanctions. See *In re Davisson*, 308 Kan. 271, 283, 419 P.3d 599 (2018); Rule 212(f) (2018 Kan. S. Ct. R. 255). It is also necessarily true that this court also can depart from a panel's reasoning supporting a recommendation.

Given all of the evidence in the entire record before us; the legal conclusions that Respondent violated KRPC 1.3, 1.4. 1.5, and 1.16; and the seriousness with which we are compelled to treat abandonment of clients in the positions of A.M. and A.O., we rule that the appropriate sanction in this case is a six-month suspension. We also will require that the Respondent undergo a Rule 219(d) reinstatement hearing before the suspension is lifted and she is permitted to practice law.

We emphasize that we arrive at this ruling after considering the evidence of Respondent's physical and mental health issues and the treatment she is receiving for them as potential mitigators of her ethical violations, which she and her counsel have urged this court to do. We do not consider this evidence because of its potential to remove a lawyer from active practice under the disabling incapacity concept referenced in Rule 220.

Respondent and her counsel are correct in observing that Rule 220 contemplates capacity judgments arrived at by procedures distinct from those employed in the disciplinary process, including evaluations by medical or psychological experts. Capacity

or incapacity under Rule 220 differs from the fitness to practice concepts that disciplinary panels are intended and equipped by training and experience to measure under ethics rules, including KRPC 1.1 on competence and KRPC 8.4(b) on criminal behavior that may reveal a character flaw. The majority of the panel was correct that those fitness concepts not only are but must be evaluated when reviewing evidence and recommending sanctions for ethics violations. And, as Respondent and her counsel have recognized, physical and mental health issues of a Respondent are appropriate for a disciplinary panel and this court to consider when measuring mitigating effect and recommending or ordering a sanction for an ethics violation or violations. See Rule 202 (2018 Kan. S. Ct. R. 233) ("The license to practice law in this state is a continuing proclamation by the Supreme Court that the holder is fit to be entrusted with professional and judicial matters.").

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Tammie E. Kurth be and is hereby disciplined by suspension from the practice of law for six months in accordance with Rule 203(a)(2) and that her return to practice be conditioned on a reinstatement hearing under Rule 219(d).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.

ROSEN, J., not participating.
ROBERT P. BURNS, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** District Judge Burns was appointed to hear case No. 118,944 vice Justice Rosen under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.